IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL A. EVERETT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 5440 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| COOK COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S LOCAL RULE 56.1**
**STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGMENT**

Defendant, COOK COUNTY, by and through its attorney, hereby submits its Local 56.1 statement of material facts[1] to which there is no genuine issue.

**PARTIES**

1.  Plaintiff, Carol A. Everett, is a Caucasian female resident of the Northern District of Illinois and was employed as a dentist at Cermak Health Services of Cook County ("Cermak") from June 14, 1982 until March 30, 2007. (TAB 1, Second Amended Complaint, ¶ 2, 8, 13)

2.  Defendant is Cook County. (TAB 1, ¶ 9)

**JURISDICTION AND VENUE**

3.  Plaintiff's Second Amended Complaint invokes jurisdiction pursuant to the consent decrees and judgments entered in *Shakman v. Democratic Organization of Cook County, et al.*, No. 69 C 2145 (the "*Shakman Decree*"), the First Amendment of the United States Constitution under 42 U.S.C. §1983, 42 U.S.C. §1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et seq.* (TAB 1, ¶1, 4) Plaintiff's Second Amended Complaint also

---

[1] For purposes of this motion only, the statements made herein are taken as true. Defendant reserves the right to challenge Plaintiff's deposition statements and allegations in the complaint outside the context of its motion for summary judgment.

invokes supplemental jurisdiction over Plaintiff's state law writ of certiorari claim pursuant to 42 U.S.C. §1367(a). (TAB 1, ¶ 7)

4. Venue is proper in this Court because all of the events at issue occurred in this judicial district. (TAB 1, ¶10)

**PLAINTIFF'S EMPLOYMENT**

5. Plaintiff began working for Cermak as a Dentist I in June, 1982. (TAB 2, Plaintiff's Deposition, p. 7, line 17-p. 8, line 4)

6. From 1982-1990 or 1991, Plaintiff worked full-time. (TAB 2, p. 9, line 3-11) From 1990 or 1991-2005, Plaintiff worked less than full-time. (TAB 2, p. 9, line 7-p. 10, line 8) Then, from 2005-2007, Plaintiff worked full-time. (TAB 2, p. 10, line 8, p. 12, line 17-20)

7. Plaintiff's position was reclassified to a Dentist II in January, 2003, along with the other dentists at Cermak. (TAB 2, p. 13, line 13-p. 14, line 10; TAB 3, Dentist Reclassification Documents)

8. During her employment at Cermak, Plaintiff provided dental care to detainees within various dental clinics set up in divisions of the Cook County Jail facility located at 26th and California. (TAB 2, p. 14, line 14-15, p. 15, line 20-22)

9. From January, 2007 until April or March, 2008, Dr. Robert Simon served as the Interim Bureau Chief of the Bureau of Health for Cook County. (TAB 5, Dr. Simon Deposition, p. 5, line 6-25) Dr. Simon reported directly to Cook County Board President Todd Stoger. (TAB 5, p. 6, line 1-2)

10. In 2007, David Fagus was the Chief Operating Officer of Cermak, Dr. Sergio Rodriguez and Dr. Connie Manella were the Medical Directors at Cermak. (TAB 6, Dr. Couture

Deposition, p. 26, line 25–p. 27, line 2; TAB 9, Dr. Knox Deposition, p. 21, line 10-12; TAB 2, p. 24, line 18-22)

**BUDGET CUTS**

11. In 2007, the Cook County budget had a shortfall of $500 Million, and $130 Million of that amount was to be cut from the health care budget. (TAB 5, p. 7, line 19-23)

12. On January 7, 2007, President Stroger and his administration directed Dr. Simon to submit a series of recommendations to trim the health care budget, including the Cermak budget, to meet the financial goals set forth by the President and the County Board while having the least possible impact on essential services and quality of care. (TAB 5, p. 6, line 7-23; p. 7, line 6-p. 8, line 22) The recommendations were to be submitted within six weeks, prior to the budget approval deadline of February 29, 2009. (TAB 5, p. 8, line 3-9)

13. Dr. Simon put together a team of people to evaluate the facilities and present recommendations to effectuate $100 Million in cuts from the County's health care budget. (TAB 5, p. 8, line 10-21) Each of these directors presented their recommendations detailing the restructuring and the impact it would have. (TAB 5, p. 32, line 17-24)

14. Dr. Simon made the final decisions regarding the budget cut recommendations. (TAB 5, p. 25, line 13-15)

15. In December, 2006-January, 2007, Dr. Simon assigned Dr. Eileen Couture to evaluate all of the programs at Cermak, including the Dental Department, on the basis of productivity, services provided, and patient numbers, to determine what services were necessary and essential according to the National Commission on Correctional Healthcare and achieve a 17% cut from the budget. (TAB 6, p. 28, line 6-p. 29, line 2, p. 29, line 12-20; TAB 5, p. 5, line 6-25)

16. Dr. Couture was the Director of Emergency Services at Cermak from 2000 or 2001 to 2004. (TAB 6, p. 7, line 15-22) Then Dr. Couture was transferred to Oak Forest Hospital as the Clinical Chair of Emergency Services, but remained an attending physician at Cermak in the Emergency Department. (TAB 6, p. 7, line 15-22; p. 13, line 4-7) From February, 2007–August, 2008, Dr. Couture was the Interim Medical Director at Cermak. (TAB 6, p. 7, line 15-22)

17. The Personnel Rules for Physicians and Dentists governed the terms and conditions of employment of the dentists at Cermak in 2007. (TAB 2, p. 111, line 22-p. 112, line 11; TAB 4 Cook County Bureau of Health Services Personnel Rules For Physicians And Dentists) Rule 7 sets forth the procedure for administering a layoff and does not require that Cook County use seniority in implementing a layoff or contain any provision for review of a layoff decision. (TAB 4, Rule 7) Rule 8 identifies the procedures for administering discipline, including a grievance process for review of disciplinary action. (TAB 4, Rule 8)

18. There are no rules that require Cook County to use seniority alone in implementing layoffs of physicians and dentists. (TAB 5, p. 36, line 25-p. 37, line 3; TAB 4)

19. On January 17, 2007, Dr. Simon met with Kim Gilmore, Chief of Cook County Human Resources, and Lance Tyson, Chief of Staff to President Stroger, to discuss how to develop a selection process for non-union employees, such as physicians and dentists, wherein they use criteria that would allow the selection of the best possible candidate since they did not have to make the determination only on seniority. (TAB 5, p. 27, line 3-p. 28, line 14, p. 37, line 25-p. 39, line 6; TAB 13, Memo from Dr. Simon dated January 18, 2007)

20. For physician and dentist positions, it was important to consider factors other than seniority because in many situations, especially in the County system, those individuals with the

4

most seniority do less clinical work, are primarily administrative, or may not have as much experience in a particular area, and the decision should be made as to who is best for the patients, not just on seniority. This is particularly true where a restructuring is taking place. (TAB 5, p. 35, line 5-p. 36, line 24)

21. Dr. Simon directed the medical directors, including Dr. Couture, to determine the best person for the remaining physician and dental positions and if that person has the highest seniority then it was not necessary to conduct any interviews to determine who would retain the position. If, however, the person recommended for the position after the reduction does not have the highest seniority, the recommendation must be based on objective and fair criteria which can be justified, such as productivity, management skills, position requirements, evaluations, and hours worked. If everything else was equal, the most senior person should be retained. (TAB 5, p. 21, line 9-p. 22, line 20, p. 33, line 19-p. 34, line 2)

22. Interviews of physicians to determine who would remain were conducted where a group of positions was reduced to a few spots, such as ten positions reduced to three. (TAB 5, p. 11, line 17-p. 13, line 22, p. 22, line 5-20) Interviews were not necessary where one person was being retained and the director could make the determination based on the data and information available, such as was the case in the Cermak Dental Department. (TAB 5, p. 22, line 5-20, p. 23, line 2-11)

**CERMAK DENTAL DEPARTMENT**

23. In February, 2007, there were five salaried dentists working at Cermak: Dr. Jack Liu, a Chinese-American male, Dr. Shandra Bundy-Smith, an African-American female, Dr. Townsend, an African-American male, Dr. Allen Knox, an African-American male, and Plaintiff, a Caucasian female. (TAB 2, p. 28, line 10-20, p. 203, line 14-p. 204, line 1; TAB 1, ¶

5

2) Dr. Allen Knox was the Dental Director and the others held the position of Dentist II. (TAB 2, p. 29, line 6-p. 30, line 8)

24. Dr. Couture identified that the standards for dentistry pursuant to the National Commission on Correctional Health Care require that emergency dentistry must exist and the detainees must have access to it. The standard does not require that a certain number of dental patients a day or that a root canal must be performed and, as such, Dr. Couture believed that dental services at Cermak would be reduced to serving only recommended emergent needs. (TAB 6, p. 35, line 15-24, p. 50, line 2-9)

25. In mid-late January, Dr. Simon determined that in light of the amounts that needed to be cut from the budget and the fact that the law required only that dental services be provided in emergency situations, the dental department could be reduced to one dentist at Cermak. (TAB 5, p. 17, line 23-p. 18, line 18; TAB 5, p. 21, line 2-5) At no time did Dr. Simon consider retaining two dentists at Cermak. (TAB 5, p. 21, line 6-8)

26. Dr. Couture was not required to conduct interviews of the dentists at Cermak because only one dentist was being retained. (TAB 5, p. 41, line 2-5)

27. Dr. Couture never considered the selection of the remaining dentist to be a choice between Dr. Townsend and Dr. Everett. (TAB 6, p. 53, line 5-7)

28. Prior to Dr. Simon's and Dr. Couture's involvement in 2007 with Cermak, two previous bureau chiefs were directed to prepare a plan to cut the Cermak budget. (TAB 6, p. 38, line 12-25) Dr. Couture included the reduction plans from the previous bureau chief, Dr. Rodriguez, in her recommendations to Dr. Simon. (TAB 6, p. 39, line 1-21)

29. Dr. Couture had experience working with the dentists at Cermak both when she worked at Cermak and when she worked as an Emergency Room physician at Stroger, and

became aware of the work habits of the dentists, their responses or lack thereof to calls from ER physicians, their failure to treat patients or complications from their treatment resulting in the ER visit. (TAB 6, p. 63, line 2-20)

30. Dr. Couture's decision as to which dentist to retain relied upon knowledge, skills, and abilities in performing necessary and essential dental services working in correctional dentistry with limited resources and more constraints, meaning the ability to deal with pain, suffering, decay, infection, and extractions, not preventive care, root canals or fillings in private practice. (TAB 6, p. 74, line 15-p. 76, line 10, p. 77, line 14-15, p. 78, line 7-15)

31. Dr. Couture depended on people other than the dentists at Cermak to evaluate the skills, abilities, productivity, leadership, or previous management experiences of the dentists because the dental office was atrocious, disorganized, and full of papers. (TAB 6, p. 56, line 1-14)

32. Dr. Couture reviewed the personnel files of the dentists to evaluate their qualifications. (TAB 6, p. 57, line 14-p. 58, line 1)

33. Prior to the layoff, Dr. Couture reviewed productivity reports for the Dental Department generated in the normal course of data collection by nursing, administration, or the dental assistants. (TAB 6, p. 68, line 23-p. 69, line 25) The reports she utilized would be more current than 2003 and likely would be for 2005-2006 and identified the number of people being serviced and the size of the division. (TAB 6, p. 70, line 15-25, p. 71, line 20-25)

34. Dr. Couture recommended that Dr. Robert Townsend be the one dentist retained at Cermak, based primarily on her personal experience as well as her evaluation of the program and recommendations and opinions of others. (TAB 6, p. 31, line 8-16, p. 46, line 8-16, p. 62, line 5-15, p. 80, line 11-22)

7

35. Dr. Couture needed to retain someone with management experience and who could be flexible in providing dental care to the detainees after the whole system was being dismantled and in her experience at Cermak, she had gotten that response from Dr. Townsend in the past. (TAB 6, p. 65, line 2-p. 66, line 8)

36. In her experience at Cermak, Dr. Townsend always returned Dr. Couture's calls, spoke with her regarding dental care, exhibited knowledge, offered his services, was flexible in squeezing patients into his schedule for emergent care, had a grasp of more than just the patients he was treating, including system problems, not just individual problems. (TAB 6, p. 81, line 19-p. 83, line 3)

37. Dr. Townsend had management experience because he served as the Acting Director of Dental Services numerous times beginning under Dr. Scott, and through Dr. Reynolds, and Dr. Knox, where each requested that he be responsible in his/her absence, including extensive leaves under Dr. Knox. (TAB 7, Dr. Townsend Deposition, p. 33, line 12-24) In that capacity, his clinical responsibilities remained the same, but he also performed all of the duties of the Director, including attending department head meetings, signing the vacations forms, make the schedules, change the schedules, and anticipate court orders. (TAB 7, p. 43, line 5-p. 44, line 6)

38. Dr. Couture determined that Dr. Townsend had greater leadership skills than Dr. Everett and that Dr. Townsend would be the one who could reorganize the Dental Department with two assistants and himself and be the most productive. (TAB 6, p. 64, line 14-19, p. 85, line 11-24, p. 89, line 14-25)

39. Dr. Couture was advised by medical professionals of criticism of Dr. Everett, including criticism for being slow and that some of her dental patients had to be seen by other dentists. (TAB 6, p. 90, line 17-p. 91, line 5)

40. In January – February 2007, Dr. Couture submitted her report of recommendations to Dr. Simon as to how to cut the required budget while retaining the necessary and essential services. (TAB 6, p. 29, line 4-7, 21, 23-p. 30, line 7, 11-19)

41. Dr. Couture was not involved in the decision to lay off physicians. (TAB 6, p. 40, line 18; p. 41, line 4) The final decision as to who was retained and who was laid off was made by Dr. Simon. (TAB 5, p. 25, line 13-15)

42. Dr. Couture advised Dr. Simon that she selected a dentist for retention who was not the most senior, but the person whom she thought had the best productivity, the best ability to do management or experience with management and who was the best of the dentists at Cermak. (TAB 5, p. 25, line 18-p. 26, line 18)

43. Dr. Couture never provided Dr. Simon with any written document explaining how she arrived at the decision to recommend that Dr. Townsend be retained as the dentist at Cermak. (TAB 5, p. 33, line 3-7)

44. Dr. Couture made recommendations based on the program and what was needed when the Dental Department changed after the layoffs, not based on seniority or age, political considerations, gender, or race. (TAB 6, p. 45, line 9-p. 46, line 2, p. 102, line 3-7, 14-16, 18-20)

45. Dr. Couture was never aware of any political position or affiliation held by either Dr. Townsend or Dr. Everett. (TAB 6, p. 102, line 8-13)

46. Dr. Simon does not know Dr. Everett, Dr. Townsend or Dr. Liu. (TAB 5, p. 28, line 23- p. 29, line 1-12)

47. Dr. Simon's decision as to who would remain the sole dentist at Cermak was not based on politics in any way. At no time did anyone from the administration ask Dr. Simon to keep a doctor or a nurse or a dentist in place based upon who they wanted or interfere in any way with the process. (TAB 5, p. 37, line 4-12)

48. At no time did Dr. Simon use race or gender in any way as a determining factor with regard to the layoff of dentists at Cermak. (TAB 5, p. 37, line 13-21)

49. Dr. Everett admits she has no information or knowledge that Dr. Couture knew about Dr. Townsend's political affiliation, if any. (TAB 2, p. 193, line 16-19)

50. Dr. Everett admits she has no information or knowledge that Dr. Simon was aware of Dr. Townsend's political affiliation, if any. (TAB 2, p. 193, line 23-p. 194, line 2)

51. Dr. Everett admits she has no information that Dr. Couture based any of her decisions relating to the dentists at Cermak on race or gender. (TAB 2, p. 209, line 10-14, p. 214, line 17-22)

52. Dr. Everett admits she has no information that Dr. Simon based any of his decisions regarding the dentists at Cermak on race or gender. (TAB 2, p. 209, line 15-18, p. 214, line 23-p. 215, line 3)

53. In February, 2007, layoff letters were sent to three of the dentists at Cermak: Dr. Liu, Dr. Bundy-Smith, and Dr. Knox. (TAB 2, p. 28, line 5-20) The letters were erroneously issued and subsequently rescinded. (TAB 17, Memo from Dr. Simon dated February 22, 2007)

54. On March 29, 2007, Dr. Everett was laid off. (TAB 2, p. 48, line 20-p. 49, line 4, p. 49, line 15-16; TAB 12, Layoff Letter to Dr. Everett dated March 27, 2007)

55. Dr. Everett first became aware that Dr. Townsend was retained when he called her Monday night and advised her that he went to work on Monday after being off Thursday and

Friday and went into Dr. Couture's office to relinquish his ID wherein he was advised by Dr. Couture that he was selected as the remaining dentist. (TAB 2, p. 56, line 16-p. 57, line 8) Dr. Everett thought that Dr. Townsend inferred that since she was laid off, he also would be laid off because she was the senior dentist. (TAB 2, p. 58-line 21-p. 60, line 6)

**COMPARATORS**

56. Dr. Ronald Townsend was hired on January 25, 1993 as a Dentist at Cermak. (TAB 7, p. 6, line 15-p. 7, line 4) Dr. Townsend's always worked full time. (TAB 7, p. 7, line 5-7) Dr. Townsend is currently a Dentist II. (TAB 7, p. 15, line 6-8)

57. In dental school, Dr. Townsend was a Department of Public Health scholarship recipient and, as such, his dental school was paid in exchange for a commitment of service to preselected entities after graduation. Cermak was on this list and Dr. Townsend applied. (TAB 7, p. 7, line 8-p. 8, line 3) Dr. Townsend was interviewed by Dr. Pouisis and Dr. Scott. (TAB 7, p. 8, line 6-19) No references were submitted on his behalf. (TAB 7, p. 8, line 23-p. 9, line 4) He received a letter in the mail advising him he was hired. (TAB 7, p. 8, line 20-22)

58. Dr. Townsend began a private dental practice in 1990-1991 at 654 E. 75th Street. (TAB 7, p. 9, line 8-20) Dr. Townsend moved his practice to 452 E. 75th Street around 2004. (TAB 7, p. 9, line 17-p. 10, line 10) His practice has always been part time. (TAB 7, p. 10, line 17-19)

59. Dr. Townsend's dental clinic made a single $300.00 campaign contribution to the 8th Ward Regular Democratic Organization in September, 2000. (TAB 7, p. 36, line 15-25; TAB 11, Contribution List) Dr. Townsend's dental clinic made two campaign contributions to Citizens for Lyle in April, 2006 and May, 2006 totaling $225.00. (TAB 7, p. 36, line 15-25;

TAB 11) No other campaign contributions were made prior to the layoffs in March, 2007. (TAB 11)

60. Dr. Townsend does not know who the 8th Ward is, where the 8th Ward is located, or if it is adjacent to the ward in which his office is located. (TAB 7, p. 37, line 24-p.38, line 3, p. 38, line 22-p. 39, line 1) Dr. Townsend is not aware that Todd and John Stroger's political base is in the 8th Ward. (TAB 7, p. 39, line 21-24) Dr. Townsend made the contribution to the 8th Ward because he bought tickets from and was going to attend the event with Dr. Knox. (TAB 7, p. 39, line 2-20)

61. Dr. Townsend knows his office is in the 6th Ward and that his City of Chicago Alderman is Ms. Lyle. (TAB 7, p. 38, line 14-21) Dr. Townsend knows William Beavers, who previously was a City of Chicago Alderman. (TAB 7, p. 38, line 6-11)

62. Dr. Knox believes that Dr. Everett's going after Dr. Townsend was the wrong thing to do because Dr. Townsend has no clout. (TAB 9, p. 39, line 16-p. 40, line 2)

63. Prior to the layoffs, Dr. Townsend was not interviewed and he did not have any conversations with Dr. Couture, Dr. Simon, Mr. Fagus, Dr. Knox, or anyone associated with Cook County government regarding the reduction in force, his skills, productivity, leadership abilities, previous management experience, why he was retained, or any desire on his part to assume a leadership role at Cermak. (TAB 7, p. 26, line 15-p. 29, line 5)

64. Later in 2007, because the dental services at Oak Forest Hospital were being eliminated, Dr. Couture and the CEO of Oak Forest Hospital decided to transfer Dr. Tom Prozorovski to Cermak to provide dental services there. (TAB 6, p. 9, line 24 –p. 10, line 1-20; TAB 10, David Fagus Deposition, p. 25, line 5-25) Dr. Prozorovski was the Chief Dental Surgeon at Oak Forest. (TAB 7, p. 15, line 23-25) There was not an open position at Cermak;

rather Dr. Prozorovski was borrowed to Cermak and paid out of the Oak Forest budget. (TAB 6, p. 10, line 25–p. 11, line 23) Dr. Prozorovski was transferred to the Cermak budget in 2008. (TAB 6, p. 12, line 16-25)

65. Dr. Prozorovski is a 47-48 year old Caucasian male who speaks four languages, including fluent Spanish. (TAB 7, p. 18, line 12-17, p. 19, line 7-11)

66. In 2008, Dr. Liu was hired as a dentist at the Juvenile Temporary Detention Center ("JTDC") four days a week and at Cermak one day a week for a short period of time while repairs and upgrades were made at the JTDC. (TAB 7, p. 21, line 6-p. 22, line 7; TAB 10, p. 26, line 15-p. 27, line 1)

67. Dr. Townsend first learned that Cook County was considering a reduction in force related to the dentists at Cermak from Dr. Everett about six months prior to the layoffs. (TAB 7, p. 22, line 23-p. 23, line 6) Dr. Everett told Dr. Townsend that she would be the remaining dentist. (TAB 7, p. 23, line 8-p. 24, line 14.)

68. Dr. Everett never told Dr. Knox that she wanted to be the Acting Director. (TAB 9, p. 26, line 24-p. 27, line 8) If Dr. Everett wanted to be the Acting Director in his absence, she could have told him. (TAB 9, p. 27, line 4-5)

69. Dr. Knox conducted evaluations of Dr. Townsend and felt his performance of his duties and responsibilities was quite sufficient, he is a very good dentist, is successful, and has done very well. (TAB 9, p. 45, line 11-20)

70. Dr. Everett claims that she assumed a management role at times when she was the only dentist available when a clinical emergency arose and she covered for another dentist, but she cannot remember when any such instance occurred and has no specific recollection of this occurring between 2005-2007. (TAB 2, p. 18, line 19-p. 20, line 16)

71. Dr. Everett claims that she assumed a management role because she supervised the dental assistants that worked under her direction and acknowledges that all of the dentists at Cermak perform this role. (TAB 2, p. 20, line 17-p. 21, line 1)

72. Dr. Everett claims that she assumed a management or leadership role because she prepared letters to management 5-10 times on behalf of the dentists regarding clinical and staffing issues, but she cannot recall doing so between 2005-2007. (TAB 2, p. 21, line 2-p. 22, line 24)

73. Dr. Everett claims that she first became aware that there would be layoffs at Cermak when layoff letters were sent to all of the dentists except her and Dr. Townsend in February, 2007. (TAB 2, p. 27, line 12-p. 28, line 9)

74. Dr. Everett claims that she had a conversation with Dr. Townsend in late February-March, 2007, the sum and substance of which consisted of Dr. Townsend telling her that the two of them would be the two remaining dentists at Cermak and she did not say anything. (TAB 2, p. 37, line 19-p. 38, line 12, p. 43, line 18-24)

75. On June 26, 2007, Dr. Everett was sent a letter explaining the basis for the layoff. (TAB 8, Letter from David Fagus dated June 26, 2007) David Fagus prepared the letter based upon information provided to him by Dr. Couture. (TAB 10, p. 36, line 16-20, p. 37, line 2-3, 7-24)

76. Pursuant to a request by Dr. Everett, Cook County conducted a hearing by an independent hearing officer for the purpose of reviewing the decision to layoff Dr. Everett. (TAB 14, Letter from Plaintiff's counsel dated May 9, 2007) A hearing was conducted on June 29, 2007 and a decision was issued upholding the layoff decision. (TAB 15, Letter dated August 2, 2007 from hearing officer)

77. In 1972, Cook County entered into a Consent Decree, which prohibited Cook County from, *inter alia*, "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." (TAB 16, Supplemental Relief Order) In 1994, Cook County entered into a Consent Decree which incorporated and extended the provisions of the 1972 Consent Decree. (TAB 16) On November 30, 2006, Cook County entered into the Supplemental Relief Order For Cook County which established a plan of compliance pursuant to the Consent Decrees. (TAB 16)

Respectfully Submitted,

ANITA ALVAREZ
State's Attorney of Cook County

By:  /s/ Lisa M. Meador
     Lisa M. Meador
     Assistant State's Attorney
     500 Richard J. Daley Center
     Chicago, Illinois 60602
     (312) 603-4186
     Fax (312) 603-3000
     ARDC Number 6270259